**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| UMBANET, INC., <br><br>             *Plaintiff*, <br><br> v. <br><br> EPSILON DATA MANAGEMENT, LLC, <br><br>           *Defendant*. | Case No. 2:16-cv-00682-JRG |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is the opening claim construction brief of Umbanet, Inc. ("Plaintiff") (Dkt. No. 65, filed on April 10, 2017);[1] the response of Epsilon Data Management, LLC ("Defendant") (Dkt. No. 73, filed under seal on April 24, 2017); and the reply of Plaintiff (Dkt. No. 79, filed on May 3, 2017). The Court held a hearing on the issues of claim construction and claim definiteness on June 1, 2017. Having considered the arguments and evidence presented by the Parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the Parties' filings are to the filing's number in the docket (Dkt. No.), and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.      BACKGROUND ..................................................................................................... 3

II.     LEGAL PRINCIPLES ......................................................................................... 5

    A.      Claim Construction ................................................................................... 5

    B.      Departing from the Ordinary Meaning of a Claim Term ........................ 8

    C.      Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ......... 10

    D.      Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ................ 12

III.    THE ENCODING/DECODING TERMS ........................................................... 13

IV.     CONCLUSION .................................................................................................. 21

## I.    BACKGROUND

Plaintiff alleges infringement of two related U.S. Patents: No. 7,076,730 ("the '730 Patent") and No. 7,444,374 ("the '374 Patent"). The '374 Patent issued from a continuation-in-part of the '730 Patent's application. The Court previously heard cross-motions regarding the validity of these patents under 35 U.S.C. § 101. *Umbanet, Inc. v. Epsilon Data Mgmt., LLC*, No. 2:16-cv-682-JRG, 2017 U.S. Dist. LEXIS 59311 (E.D. Tex. Apr. 18, 2017), Dkt. No. 71. The Court held the '374 Patent invalid under § 101. *Id.* at *12. The Court declined to rule on the validity of the '730 Patent under § 101 pending construction of the claims of that patent. *Id.* Accordingly, the Court here addresses only the '730 Patent's claims. Further, as set forth below, the Court determines that the asserted claims are invalid for failure to meet the structure-disclosure requirement of 35 U.S.C. § 112, ¶ 6 with respect to "encoding means for automatically encoding said representation created with said authoring components into an Internet-compatible email message," "decoding means for automatically decoding said representation encoded by said encoding means," and "document-encoding component which encodes the document as Internet-compatible email." Having determined that the claims are invalid, and noting that this holding resolves the Parties' dispute, the Court declines to construe the remaining terms in dispute.

The '730 Patent is entitled "Electronic Mail Software with Modular Integrated Authoring/Reading Software Components." The application leading to the '730 Patent was filed on December 10, 1998, and the patent issued on July 11, 2006.

In general, the '730 Patent is directed to technology to simplify the user experience with electronic mail. More specifically, the invention of the '730 Patent is meant to simplify authoring, sending, receiving, and reading email that includes non-text content (e.g., an email with image, database, spreadsheet, or presentation content) by integrating the content-creating and content-

reading functions with the email functions. The patent describes the failings of the prior art as related to: (1) separate content-creation and email-encoding-and-sending applications, and (2) separate content-reading and email-receiving-and-decoding applications. '730 Patent at 1:65–2:48. The stated objects of the invention include providing email software that enables "seamless" creating/sending and receiving/reading of "different kinds of documents." *Id.* at 2:51–67. This "seamless" nature is provided by an email application that integrates the functions into a single interface or application. *See, e.g., id.* at 3:1–5 (describing the software as providing "an interface that suggests a single application is operating"), 4:25–27 ("The software according to the invention provides a single seamless environment for authoring, reading, and emailing a variety of different types of documents."). As further explained in the patent,

> [T]he electronic mail software of the present invention includes a main email component and a number of installable components which communicate bidirectionally with the email component. The installable components include authoring/reading components as well as at least one mailbox browser/editor component. The main email component provides an underlying graphical user interface (GUI) for functions directly associated with the storage and transfer of electronic mail messages. In particular, the main email component provides menu items which allow the user to SEND, READ, REPLY, FORWARD, DELETE, SAVE, PRINT, for example. The main email program also handles all data bundling and unbundling that may be required to transform a message created by an authoring component into a fully MIME compliant message. In addition, the main email component includes "hooks" (an application programming interface or API) for the attachment of the installable components. The authoring/reading components each provide functionality which is particular to the type of document the component is designed to create/display.

*Id.* at 3:15–35.

> Likewise, the abstract of the '730 Patent provides:

> Electronic mail software includes a main email component and a number installable components. The installable components include authoring/reading components for creating/reading different kinds of documents and mailbox components for listing different kinds of messages or for listing messages in different styles. The main email component provides an underlying graphical user interface for functions directly associated with the storage and transfer of electronic mail messages, and also handles all data bundling and unbundling required to transform a message

4

created by an authoring component into a MIME compliant message. The authoring/reading components act like applications embedded within the email program and allow specific types of documents such as spreadsheets, graphics, databases, etc. to be created from within the email program and emailed directly. The authoring/reading components also allow received documents to be read without the difficulties traditionally associated with attaching binary files to an email letter. The authoring components of the invention pass data to the main email component which packages the data as a MIME compliant message. When the message is received, the main email component concatenates and decodes the MIME message and sends the data to the authoring/reading component associated with the MIME type.

Claims 1 and 19 of the '730 Patent, exemplary system and method claims respectively, recite as follows:

**1**. An electronic mail client embodied in an executable computer-readable medium, comprising:
  a) a plurality of authoring and reading components, a first of said plurality of authoring components for creating a representation of a document including an other than text portion and for creating the other than text portion of the document;
  b) encoding means for automatically encoding said representation created with said authoring components into an Internet-compatible email message; and
  c) decoding means for automatically decoding said representation encoded by said encoding means, wherein said encoding means and said decoding means communicate bidirectionally with said authoring components.

**19**. A method of authoring a document and sending it by electronic mail, said method comprising:
  a) providing a document-authoring component which authors a portion of a document which is other than a plain-text;
  b) providing a document-encoding component which encodes the document as Internet-compatible email;
  c) linking the document-authoring component with the document encoding component such that documents generated under said document-authoring component are automatically encoded as Internet-compatible email.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*,

381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed below—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). However, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either

in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). *See also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

### C. Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA)[3]

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Section 112, Paragraph 6, provides that a structure may be claimed as a "means . . . for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

However, § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes

---

[3] The Court refers to the pre-AIA version of § 112 but understands that there is no substantial difference between functional claiming under the pre-AIA version and under the AIA version of the statute.

"sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general purpose computer but rather

the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### D.     Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)[4]

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 2124. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 2130. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *Id.* at 2130 n.10. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005); *accord Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (citing *Datamize*, 417 F.3d at 1351).

---

[4] The Court refers to the pre-AIA version of § 112 but understands that there is no substantial difference between definiteness under the pre-AIA version and under the AIA version of the statute.

In the context of a claim governed by 35 U.S.C. § 112, ¶ 6, the claim is invalid as indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed functions. *Williamson*, 792 F.3d at 1351–52. The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id.* at 1352.

## III.    THE ENCODING/DECODING TERMS[5]

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "encoding means for automatically encoding said representation created with said authoring components into an Internet-compatible email message"<br><br>• '730 Patent, Claim 1 | Not governed by 35 U.S.C. § 112(6).<br><br>• an encoder that automatically bundles, packages, transforms, or translates representations created with the authoring/reading components into an Internet compatible email message<br><br>**Alternative**:<br>• **function**: automatically encoding representations created with said authoring/reading components into an Internet-compatible email message<br>• **structure**: see Joint Claim Construction Chart Ex. A at 6 (Dkt. No. 80-1 at 7). | Governed by 35 U.S.C. § 112(6). Indefinite.<br><br>• **function**: automatically encoding representations created with said authoring/reading components into an Internet compatible email message; automatically encoding said representation created with said authoring components into an Internet-compatible email message<br>• **structure**: none |

____

---

[5] For all term charts in this Order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the Parties' Joint Claim Construction Chart (Dkt. No. 80) are listed.

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "decoding means for automatically decoding said representation encoded by said encoding means"<br><br>• '730 Patent, Claim 1 | Not governed by 35 U.S.C. § 112(6).<br><br>• a decoder that automatically unbundles, unpackages, transforms, or translates representations encoded by the encoder<br><br>**Alternative**:<br>• **function**: automatically decoding said representation encoded by said encoding means<br>• **structure**: see Joint Claim Construction Chart Ex. A at 7–8 (Dkt. No. 80-1 at 8–9). | Governed by 35 U.S.C. § 112(6). Indefinite.<br><br>• **function**: automatically decoding said representation encoded by said encoding means<br>• **structure**: none |
| "a document-encoding component which encodes the document as Internet-compatible email"<br><br>• '730 Patent, Claim 19 | Not governed by 35 U.S.C. § 112(6).<br><br>• a component that bundles, packages, transforms, or translates the document as Internet-compatible email<br><br>**Alternative**:<br>• **function**: encodes the document as Internet-compatible email<br>• **structure**: see Joint Claim Construction Chart Ex. A at 8–9 (Dkt. No. 80-1 at 9–10). | Governed by 35 U.S.C. § 112(6). Indefinite.<br><br>• **function**: encodes the document as Internet-compatible email<br>• **structure**: none<br><br>**Alternative**:<br>• a functional software module for encoding documents that converts the document into electronic mail that is capable of being sent over the Internet |

Because the Parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff argues that the "encoding means . . ." and "decoding means . . ." terms are names for specific structures and are therefore not governed by 35 U.S.C. § 112, ¶ 6. (Dkt. No. 65 at 24–28.) Specifically, Plaintiff contends that the "encoding means" are software encoders "that bundle or package" the recited information ("said representation") into the recited format ("Internet-

compatible email message"). (*Id.* at 25.) Likewise, the "decoding means" are software decoders that "unbundle or unpackage Internet-compatible email." (*Id.* at 27–28.) With respect to the "document-encoding component . . ." term, Plaintiff argues that the structural nature of the term is evinced by the language surrounding "component"; namely, "document-encoding" and "encodes the document as Internet compatible email." (Dkt. No. 65 at 30.) Thus, Plaintiff concludes that the presumption against applying 35 U.S.C. § 112, ¶ 6 to this term stands. (*Id.* at 29.) Finally, Plaintiff contends that even if these terms are governed by § 112, ¶ 6, the '730 Patent provides sufficient structure in that it incorporates Internet protocol Requests for Comments (RFC) 2045, 2046 and 2047, which provide protocols for encoding/decoding representations into Internet-compatible email format. (*Id.* at 26, 28, 30.)

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: Intrinsic evidence: '730 Patent 1:50–64, 3:65–4:5, 11:15–24, 11:51–64. Extrinsic evidence: Baker Decl. ¶¶ 42, 44, Exs. B, C, D (Plaintiff's Ex. J, Dkt. No. 67-10 at 14–17, 25–52, 53–91, 92–105).

Defendant responds that Plaintiff has not overcome the presumption that § 112, ¶ 6 applies to the encoding-means and decoding-means terms. (Dkt. No. 73 at 22–23.) Specifically, Defendant contends that these terms are recited in the claims and described in the '730 Patent with respect to a desired output rather than with an "algorithmic structure for providing that output," and there is no evidence that the terms were used in the art to denote structure. (*Id.*) Similarly, the document-encoding-component term is subject to § 112, ¶ 6 since neither "component" nor the surrounding claim language connote structure—the term is associated solely with function. (*Id.* at 27–28.) Defendant further argues that the '730 Patent does not provide structure to perform the recited functions but rather simply refers to converting an undefined data structure into another data

structure that is expressly "to be determined." (*Id*. at 22–23 (quoting '730 Patent, cols. 257–58).)

Further, Defendant contends that the function of the claims is not clearly linked to a conventional

MIME encoder and therefore it would be improper interpret the Encoding/Decoding terms as such

structure. (*Id*. at 23–26, 28.) Rather, the only association between the recited functions and

structure invokes "a (custom) MIME mail handler" that is not specified. (*Id.* at 23–26, 28 (quoting

'730 Patent File Wrapper July 15, 2002 Petition for One Month Extension of Time to Reply 3,

Dkt. No. 74-2 at 4).)  Finally, Defendant contends that the RFC documents cited by Plaintiff fail

to satisfy § 112, ¶ 6 for two reasons: first, they fail to provide structure for encoding or decoding

other-than-text information, as required by the claims; and second, they were published after the

claimed date of conception, and because "[c]onception must include every feature or limitation of

the claimed invention," it would be improper to use the RFC documents to define features or

limitations of the invention of the '730 Patent. (*Id.* at 25–26 & n.7, 28 (quoting *REG Synthetic

Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954, 962 (Fed. Cir. 2016) (modification by the Court)).)

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic

evidence to support its position: Intrinsic evidence: '730 Patent 11:15–17, cols.247–258

(Appendix F); '730 Patent File Wrapper July 15, 2002, Petition for One Month Extension of Time

to Reply (Defendant's Ex. 2, Dkt. No. 74-2). Extrinsic evidence: Keller Decl. ¶¶ 33, 34, 38, 39,

46, 47 (Dkt. No. 75 at 13–25, 39).

Plaintiff replies that the structural nature of the encoding means and the decoding means is

informed by the claim language "requiring the encoder and decoder to communicate

bidirectionally with the authoring components." (Dkt. No. 79 at 10.) Further, Plaintiff notes that

in the '730 Patent's description of the encoding/decoding means as a "(custom) MIME mail

handler," the "custom" aspect refers to the customization of content types allowed by the MIME

standard. (*Id.* at 11.) Thus, Plaintiff concludes that the protocols of the RFC documents provide structure sufficient to inform one of skill in the art how to implement the encoder and what the claim language means. Plaintiff emphasizes that those documents were published as of the filing date—which is the reference date for claim construction. (*Id.* at 12.)

Plaintiff cites further intrinsic and extrinsic evidence to support its position: Intrinsic evidence: '730 Patent at 3:63–4:2; '374 Patent fig.2. Extrinsic evidence: Keller Decl. ¶¶ 33, 34 (Dkt. No. 75 at 13–24).

**<u>Analysis</u>**

The parties dispute: (1) whether 35 U.S.C. § 112, ¶ 6 applies to these terms; and (2) whether the '730 Patent discloses structure sufficient to satisfy that statute. The Court now finds that the statute applies and that Plaintiff has not identified the structure corresponding to the encoding or decoding functions.

With respect to "encoding means" and "decoding means," Plaintiff has failed to rebut the presumption that § 112, ¶ 6 applies. The Court presumes that § 112, ¶ 6 applies because the terms include the "means for" language. *Williamson v. Citrix Online, LLC*, 792 F.3d 1348–49 (Fed. Cir. 2015) (en banc in relevant portion). This presumption can be overcome if the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" *Personalized Media Commc'ns, L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) (citing *Sage Prods. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427–28 (Fed. Cir. 1997)); *see also, Williamson*, 792 F.3d at 1349 (citing *Personalized Media*). Here, the only indicium of the structure of the encoding/decoding means are that they communicate bidirectionally with authoring components. There is nothing in the claims to demonstrate any of the steps involved in encoding or decoding the data. Further, the terms

"encoding means" and "decoding means" are not used elsewhere in the patent to refer to structure. Accordingly, Section 112, ¶ 6 applies.

The term "document-encoding component" is also governed by § 112, ¶ 6. The Court begins with the presumption that § 112, ¶ 6 does not apply because the term does not include the "means" language traditionally used to signal application of the statute. *Williamson*, 792 F.3d at 1347–49 & n.3. This "presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (quotation marks omitted). Here, the only indicium of the structure of "document-encoding component" is that it is linked to the document-authoring component. The "encoding component" described in the patent does not refer to a known structure in the art. Instead, the "document-encoding component" limitation almost exactly parallels the "encoding means" limitation. Accordingly, the Court determines that § 112, ¶ 6 also applies to the "document-encoding component."

Having determined that § 112, ¶ 6 applies, the Court further finds that Plaintiff has not identified structure sufficient to satisfy § 112, ¶ 6. To begin, it is not clear that the Court may rely upon the three Request for Comment documents (RFC 2045, 2046, and 2047) that Plaintiff contends disclose the encoding/decoding structures. The '720 Patent provides:

> The ability to send large quantities of binary data through the Internet electronic mail system was made possible with the MIME (Multipurpose Internet Mail Extensions) standard for Internet messages. The original MIME standard was published as an Internet Request For Comments document (RFC 1341) and approved in June of 1992. (***See Internet RFCs 2045, 2046, and 2047 for the latest MIME standards documents***.) The MIME standard describes how an email message should be formatted in order to be considered MIME compliant. MIME defines a set of message header fields and a set of message encoding standards that are designed to overcome the limitations of RFC 822 message formats and still be transportable through any of the numerous legacy mail transport systems in use on the Internet. MIME message header fields extend those defined in RFC 822 and describe the content and encoding type of the email message. Encoding schemes

allowed in the MIME standard include "quoted-printable", and "base64". In addition, three unencoded data types are allowed. These are labeled "8 bit", "7 bit", or "binary".

'730 Patent at 1:45–64 (emphasis added). The Federal Circuit has instructed that "[t]rial courts cannot look to the prior art, identified by nothing more than its title and citation in a patent, to provide corresponding structure for a means-plus-function limitation." *Pressure Prods. Med. Supplies v. Greatbatch Ltd.*, 599 F.3d 1308, 1317 (Fed. Cir. 2010).

Even if the Court may look to the RFC documents to find structure, Plaintiff has not identified any structure within these references for performing the encoding/decoding functions. Indeed, Plaintiff has not provided a single pinpoint citation to the approximately 80 pages of text that constitute the RFC documents. Rather, Plaintiff takes the position that the RFC references provide the required format for an Internet-compatible email message and, knowing this format, one of ordinary skill would "understand . . . how to implement an Internet compatible encoder for email messages containing different content type." (Dkt. No. 79 at 12.) As characterized by Plaintiff's expert,[6] the RFC documents "describe the information that must be present in an email message, how that information must be organized, and the requirements for the low level formats that can be used to represent the information." (Baker Decl. ¶¶ 42–44, Dkt. No. 67-10 at 14–17.) Plaintiff's expert further avers that a person of ordinary skill in the art "would not need a formal description to design code" to perform the recited functions. *Id*. This argument, however, improperly conflates the enablement analysis with the § 112, ¶ 6 analysis. The Federal Circuit has instructed:

> The fact that an ordinarily skilled artisan might be able to design a program to create an access control list based on the system users' predetermined roles goes to enablement. The question before us is whether the specification contains a sufficiently precise description of the "corresponding structure" to satisfy section

---

[6] It is not clear that there is a meaningful distinction between Plaintiff and its expert. (*See* Baker Decl. ¶ 3, Dkt. No. 67-10 at 2 ("I am the founder, owner, and president of Umbanet, Inc.").)

> 112, paragraph 6, not whether a person of skill in the art could devise some means
> to carry out the recited function.

*Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384–85 (Fed. Cir. 2009). Further,

Plaintiff's argument distills to: given a specification of the outcome of the function, one of ordinary

skill in the art can create the structure for that function. The Federal Circuit, however, has rejected

that a disclosure of the outcome of a function satisfies the structural-disclosure requirements of

§ 112, ¶ 6. *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir.

2008) (holding that an "equation [that] describes an outcome, not a means for achieving that

outcome . . . does not disclose the structure of the claimed device, but is only another way of

describing the claimed function."). Ultimately, "[a] patentee cannot avoid providing specificity as

to structure simply because someone of ordinary skill in the art would be able to devise a means

to perform the claimed function." *Blackboard*, 574 F.3d at 1385. Here, Plaintiff has identified, at

most, the structure of an Internet-compatible email message and contends that, given this structure,

one of ordinary skill in the art would be able to devise a means to encode such an email message.

This is not enough to satisfy § 112, ¶ 6.

The '730 Patent fails to comply with § 112, ¶ 6 for other reasons. Specifically, the

encoding/decoding functions are not simply encoding and decoding, the functions are

*automatically* encoding/decoding documents with *other-than-text content or other-than-plain-text*

*content*. Even if a specification of email structure was sufficient disclosure for the function of

encoding/decoding, such a specification says nothing of how the encoding/decoding proceeds

automatically. Further, a specification of email structure is, at most, a specification of output of

the encoding function and input of the decoding function—it is completely silent as to the structure

of the other-than-text/other-than-plain-text content which is the input to the encoding function and

output of the decoding function. This is particularly notable in that the very essence of the

invention of the '730 Patent is the seamless operation of the creating/sending and receiving/displaying of email with other-than-text content. *See, e.g.*, '730 Patent at 4:25–27 ("The software according to the invention provides a single seamless environment for authoring, reading, and emailing a variety of different types of documents."). This seamless operation relates to the inventive software's ability to encode and decode a myriad of content types without the user separately operating the encoding/decoding functions. *See, e.g.*, *id*. at 4:27–30 ("The user does not need to understand uploading, downloading, file types, file decoding, or any of the other esoteric requirements of attaching files to email."). Given the lack of particular structure for the encoding/decoding processes, the patent threatens to claim the idea of automatic encoding/decoding of other-than-text content rather than an implementation of that idea.

While Plaintiff cites various portions of the '730 Patent in the Parties' Joint Claim Construction Chart (Dkt. No. 80), neither Plaintiff nor its expert have explained how the cited material discloses a structure for automatically encoding or decoding documents that include content other than text or plain text. Defendant's expert, however, has opined that the cited material does not disclose structure for performing the encoding or decoding functions. (Keller Decl. ¶¶ 34, 43, 47, Dkt. No. 75 at 13–24, 27–39.)

Accordingly, the Court holds that the Encoding/Decoding Terms are governed by 35 U.S.C. § 112, ¶ 6, and that they fail to comply with the statute. The claims are therefore rendered indefinite.

## IV. CONCLUSION

The Court holds: (1) 35 U.S.C. § 112, ¶ 6 governs the "encoding means," "decoding means," and "document-encoding component" terms; and (2) the '730 Patent fails to satisfy the

structure-disclosure requirements of the statute with respect to those terms. Accordingly, the Court

holds that Claims 1 and 19 of the '730 Patent are invalid as indefinite.

**So ORDERED and SIGNED this 16th day of August, 2017.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE